IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**JOEY SANTIAGO,**                                  Case No. 3:15 CV 991

    Plaintiff,

    v.                                          Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                          MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Plaintiff Joey Santiago ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The parties consented to the jurisdiction of the magistrate pursuant to 28 U.S.C. § 636(c) and Local Rule 72.2(b)(1). (Doc. 12). For the reasons stated below, the undersigned affirms the Commissioner's decision to deny benefits.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI on May 26, 2011, alleging an onset date of January 1, 2009. (Tr. 235-44). Plaintiff applied for benefits due to multiple sclerosis ("M.S."). (Tr. 77). His claims were denied initially and upon reconsideration. (Tr. 77-145). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 156). Plaintiff, represented by counsel, and a vocational expert ("VE") testified at a hearing before the ALJ on November 13, 2013, after which the ALJ found Plaintiff not disabled. (Tr. 13-29, 35-76). The Appeals Council denied Plaintiff's

request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981. Plaintiff filed the instant action on May 19, 2015. (Doc. 1).

**FACTUAL BACKGROUND**

*Personal Background and Testimony*

Born June 20, 1979, Plaintiff was 34 years old as of the hearing date. (Tr. 42). He lived with his father and step-mother in a one-story house. (Tr. 43). Plaintiff had his driver's license revoked for child support payment issues; he has four kids from a previous marriage that he sees 3-5 times a week. (Tr. 43-44, 308). He completed the eleventh grade. (Tr. 44). Plaintiff last worked in 2008 painting roads; he stated he left the job due to cold weather and an impending lay-off. (Tr. 45-46).

He reported problems with sleeping because the neurological pain felt like electrocution but he spent most of the day in bed. (Tr. 46, 55, 315). Plaintiff testified to an inability to tolerate cold temperatures and problems with speaking. (Tr. 46, 309, 315). He also testified that the pain and weakness was worse on the left side and he needed a cane for balance; he also sometimes used a wheelchair in the house. (Tr. 51). He estimated the pain was a seven out of ten, and the weakness was an eight out of ten on good days, of which there were two to four per week. (Tr. 316). Plaintiff stated he had multiple flare-ups a week which lasted two to three days at a time. (Tr. 54). Plaintiff also reported constant depression that related to his decreased physical health. (Tr. 56, 310). The depression was accompanied by social aversion and anxiety, but he was not attending psychiatric counseling. (Tr. 57). He had been prescribed Trileptal, Depakote, Baclofen, Neurontin, Oxycodone, and Doxepin for the past two years. (Tr. 48). According to Plaintiff, the medication caused stomach issues, insomnia, migraines, vision blurriness, and fatigue; and was not effective at controlling his symptoms. (Tr. 49, 311, 318).

As to daily activities, Plaintiff stated he could only sometimes perform his personal grooming and hygiene. (Tr. 47, 305, 338). He also stated he could not make meals because of shaking hands. (Tr. 47, 305). He did not go to the store and his parents did all his shopping for him. (Tr. 48). However, Plaintiff earlier reported being able to fold his laundry, shop for short periods, and care for a dog. (Tr. 47, 305-08). Plaintiff also reported socializing with a friend, his parents, and his children, but he did not usually go to public places. (Tr. 308) He did not believe he could work because of his lack of sleep, poor attention span, poor social skills, constant pain, weakness in his legs, migraines, vision blurs, and an inability to drive. (Tr. 51).

*Relevant Medical Evidence*

On April 4, 2009, Plaintiff reported to the emergency room with complaints of right knee pain from aggravation of a knee strain; aside from his knee the physical examination was normal. (Tr. 381). He was diagnosed with right knee effusion. (Tr. 382). Plaintiff did not seek medical attention again until March 26, 2011, when he complained of left arm and leg shaking, generalized weakness, and a headache at the emergency room. (Tr. 383). At this visit, he reported prior nerve damage on his left side; a physical examination revealed normal deep tendon reflexes, sensation, and range of motion, and no focal weakness but diffuse weakness. (Tr. 383-84). A CT of Plaintiff's brain was normal. (Tr. 384). The etiology of Plaintiff's symptoms was not discovered at this visit but he was started on Flexeril. (Tr. 384).

Plaintiff underwent an MRI of his cervical spine on April 30, 2011, due to complaints of prolonged blurred vision, speech impairment, and left-sided weakness. (Tr. 386). It was revealed Plaintiff had a congenitally small cervical spinal canal; borderline spinal cord compression at C5-C6 on the right and C6-C7 on the left with spinal canal stenosis; bony neural foraminal narrowing at C3 through C6 on the right; and questionable mild hyperintense T2-weighted signal at C5 through C7 (the doctor noted this finding was not likely due to demyelination). (Tr. 386-87).

William Bauer, M.D., Ph.D., was Plaintiff's treating neurologist from 2011 until 2013. On May 3, 2011, Plaintiff established care with Dr. Bauer; his chief complaints were chronic neck and lower back pain, and bilateral leg numbness and tingling. (Tr. 413). On physical examination, Dr. Bauer noted Plaintiff was in no acute distress, displayed no memory or attention problems, no aphasia, normal ocular fields, normal nerve findings, reduced sensation bilateral lower extremities, abnormal gait, normal deep tendon reflexes on the right but left-side non-sustained clonus, normal right-side muscle strength, slightly reduced left-side muscle strength, and negative straight leg raise tests. (Tr. 414-15). Dr. Bauer diagnosed generalized weakness and demylenating disease. (Tr. 416). A few days later, Dr. Bauer performed a lumbar puncture to aid in diagnosis of M.S. or another demylenating disease; the results were inconclusive. (Tr. 405-12).

In June 2011, Plaintiff returned to Dr. Bauer to discuss medication for his chronic pain syndrome and demylenating disease. (Tr. 399). Plaintiff reported his pain level as an eight, chronic lower back pain with radiculopathy, numbness/tingling, weakness/fatigue, balance problems, vision problems, joint pain, anxiety, depression, memory loss, and headaches. (Tr. 399-400). At the time, he was taking both Oxycodone and Doxepin. (Tr. 399). Plaintiff's physical examination remained the same as his previous visit. (Tr. 400-02). On November 16, 2011, Plaintiff complained of chronic pain, migraine headaches, and increased bilateral leg pain. (Tr. 433-34). Again, the physical examination was unchanged and he described the pain as "electricity" in his arms and legs; Flexeril was added to his medications. (Tr. 434-36). Plaintiff saw Dr. Bauer again on December 14, 2011, there were no changes to his medications or in his physical examination. (Tr. 428-32).

At a follow-up in January 2012, he reported his pain level as a nine and severe throbbing headaches that interfered with sleep. (Tr. 423-24). Dr. Bauer noted his M.S. was the same and he also had persistent low back pain; further his physical examination remained unaltered from

4

previous visits. (Tr. 424-26). Depakote was added to his prescription regimen. (Tr. 423). A month later, Plaintiff reported to the emergency room twice in two days with complaints of weakness and generalized pain. (Tr. 448). His neurologic exam was grossly normal and he had sensation in all four extremities but Plaintiff was admitted for the day and administered IV medications for the pain. (Tr. 449-50). A week later, Plaintiff returned to the emergency room with complaints of worsening weakness and mobility. (Tr. 573). The doctor suggested IV steroids but Plaintiff declined in favor of IV pain medication. (Tr. 574).

Plaintiff appeared at the emergency room in May 2012 complaining of headache and left-sided stiffness. (Tr. 576). He was offered Toradol to relieve the pain, but he refused and was discharged without treatment and a recommendation to follow-up with Dr. Bauer. (Tr. 577). On July 2, 2012, Plaintiff saw Dr. Bauer again for a follow-up. (Tr. 458). At this visit, Dr. Bauer re-prescribed Flexeril and added Topamax to Plaintiff's medications. (Tr. 458). He complained of aching/sharp pain which fluctuated; the pain was generalized and localized in his right leg. (Tr. 459). His physical examination was the same as all previous visits to Dr. Bauer. (Tr. 460-61). Dr. Bauer's diagnosis was still an unspecified demylenating disease. (Tr. 462). In November 2012, Plaintiff returned to Dr. Bauer for a review of his ongoing neurological problems. (Tr. 480). Dr. Bauer's physical observations were the same as before but Plaintiff reported headaches, increased pain in his right foot, and an active M.S. flare-up. (Tr. 481-83).

In January 2013, Plaintiff reported increased left and right leg weakness but the physical exam was unchanged. (Tr. 474, 476-77). Dr. Bauer reported "[t]here was a lengthy discussion and that he refused medications and injections and therefore is noncompliant for his [M.S.]". (Tr. 476). Dr. Bauer threatened cessation of treatment if Plaintiff did not comply with recommendations by next visit. (Tr. 478). On May 1, 2013, Executive Court Medical Associates noted Plaintiff missed an appointment with Dr. Bauer and had been unable to re-fill his medications because he had been

5

in Puerto Rico for a month. (Tr. 492). Plaintiff also requested a referral to a new neurologist. (Tr. 492). On examination, Plaintiff's neurological exam was grossly normal, with normal sensation, reflexes, coordination, and muscle strength and tone. (Tr. 494).

Plaintiff returned to Dr. Bauer in May 2013; his complaints were the same – chronic pain, numbness/tingling, migraines, and fatigue. (Tr. 464). Dr. Bauer's physical exam was unchanged. (Tr. 465-67). Topamax was ceased because of negative side effects and Dr. Bauer noted that Plaintiff was still non-compliant with his M.S. treatment. (Tr. 467). A week later, Dr. Bauer reiterated that Plaintiff was non-compliant with his treatment and made no changes to his physical observations. (Tr. 469-72). He then prescribed Trileptal, an anti-convulsant, and recommended referral for Aubagio, a new M.S. treatment. (Tr. 464, 473).

In October 2013, Plaintiff began treating at the Cleveland Clinic on his own volition; his chief complaint was left-sided pain and weakness. (Tr. 520, 529). On examination, he had decreased range of motion in his left arm and leg; decreased sensation of his left cranial nerve; slightly reduced muscle strength in his left hand, shoulder, and knee; and normal muscle strength in his left ankle. (Tr. 522). Plaintiff was diagnosed with M.S. and referred to a neurologist. (Tr. 522).

The next day Plaintiff was seen by Carrie Hersh, D.O., and Plaintiff reported progressively worsening symptoms over the last two years, including left-sided numbness and weakness, shock-like pain in the low back, blurred vision, tonic spasms in the left arm and leg, and slurred speech. (Tr. 530). During the physical exam, Plaintiff complained of significant fatigue so the exam results were "somewhat effort-dependent" and he seemed moderately depressed. (Tr. 531). It was noted Plaintiff had mild dysarthria, full visual fields, reduced facial sensation but normal muscle movement in the face, reduced strength bilaterally in his upper and lower extremities, normal deep tendon reflexes, shuffling gait, and mild imbalance. (Tr. 531-33). Dr. Hersh noted the need for

repeat cranial and cervical MRIs to determine disease status. (Tr. 533). Jeffrey Cohen, M.D. reviewed the records and agreed "M.S. appears likely based on history and exam, but no records or imaging studies were available"; he also noted Plaintiff likely needed disease therapy. (Tr. 533).

On October 25, 2013, Plaintiff was admitted to the hospital (and discharged the same day) for pain control and to rule out an M.S. flare-up. (Tr. 540). An MRI of his brain and cervical spine was completed upon admission; and showed "sequelae of demylenating disease but it is negative for acute demylenation." (Tr. 540). The physical exam findings were consistent with Dr. Hersh's the week before and it was noted Plaintiff was admitted for pain control rather than for concern of M.S. exacerbation. (Tr. 543). He was prescribed Baclofen and Neurontin and Flexeril was stopped because Plaintiff reported he did not take it when at home. (Tr. 543). Neurologist Yuebing Li, M.D., Ph.D., concluded "there is no definitive evidence for multiple sclerosis exacerbation", his brain MRI showed only limited lesions, and his cervical MRI was unremarkable. (Tr. 549).

At a follow-up on October 31, 2013, Dr. Hersh noted no changes in Plaintiff's motor or sensory exam from her previous exam. (Tr. 551). Dr. Hersh remarked that the recent cranial MRI "appear[ed] mild compared to [his] clinical manifestations without evidence of spinal cord involvement." (Tr. 552). She concluded that while Plaintiff likely had M.S., further investigation was required. (Tr. 552). Dr. Hersh also suspected that "some of his symptoms are exacerbated by fatigue and depression". (Tr. 552). Dr. Cohen remarked a M.S. diagnosis remained possible but symptoms were not consistent with the MRI and he believed further investigation into Plaintiff's past medical records and further testing could help "clarify whether he, in fact, has MS." (Tr. 553).

***Consultative Examiners***

*Psychological*

On January 12, 2012, Plaintiff underwent a consultative examination with Wayne Morse, Ph.D. (Tr. 439-47). Plaintiff reported a fall on a trampoline at age seventeen that caused nerve

7

damage which has gotten progressively worse. (Tr. 439). He also reported his "first hard MS attack" was circa June 2011 but believed he experienced symptoms before that. (Tr. 439-40). Plaintiff reported his MS attacks are brought on by being startled or cold weather. (Tr. 443). Mentally, he complained of depression, panic, anxiety, PTSD, and problems with concentration and memory. (Tr. 441).

On mental status examination, Dr. Morse remarked Plaintiff was dressed appropriately, made good eye contact, and was cooperative. (Tr. 442). Plaintiff had no difficulty in speech or thought content, but his overall mood was depressed and anxious. (Tr. 442). He reported being depressed about not being able to see his kids, and admitted he was paranoid and untrusting. (Tr. 442-43). Dr. Morse estimated Plaintiff had cognitive functioning in the low average range but he had fairly good insight yet fairly poor judgment. (Tr. 443-44). Dr. Morse noted Plaintiff had "limited social and self-awareness due to his difficulty trusting others." (Tr. 444). He diagnosed Plaintiff with major depressive disorder – recurrent, severe without psychotic features, PTSD, panic disorder without agoraphobia, and generalized anxiety disorder. (Tr. 444). Dr. Morse assessed Plaintiff with a globalized assessment of functioning ("GAF") score of 49.[1]

Dr. Morse believed Plaintiff's prognosis was poor because his progressive disease would continue to negatively affect his mental state, especially without counseling or medication. (Tr. 444). He opined Plaintiff could understand and remember short and simple instructions and work procedures, but could not understand or remember detailed instructions. (Tr. 445). Dr. Morse also opined that Plaintiff would have "great difficulty sustaining an ordinary routine, performing at a

---

1. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, sever obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job). *Id.* at 34.

consistent pace, working in coordination with others, making simple work-related decisions, and completing a normal workday without significant interruptions from his mental health symptoms." (Tr. 445). Further, although Plaintiff could adhere to basic standards of neatness and cleanliness, Plaintiff would have difficulty getting along with others and handling everyday work stressors. (Tr. 446).

*Physical*

In October 2013, Plaintiff attended a consultative examination with Marsha Cooper, M.D. (Tr. 504). Muscle testing revealed full strength in both the upper and lower extremities, and he had normal gross and fine hand coordination. (Tr. 504). Dr. Cooper did not observe muscle spasm, clonus, or atrophy. (Tr. 505). Further, range of motion testing was normal in all areas tested. (Tr. 505-07).

On examination, Dr. Cooper noted that none of the medical records reviewed from Dr. Bauer "show any clinical findings of significance." (Tr. 515). She summarized the November 2011 MRI findings as "not the typical appearance of multiple sclerosis". (Tr. 515). Dr. Cooper remarked that Plaintiff provided unclear information about his disease and diagnosis, and was not taking any of his medications at the time of the exam. (Tr. 515-16). Plaintiff reported hazy vision, migraines, left side numbness, and fatigue, but denied low back pain, insomnia, and depression. (Tr. 516). Dr. Cooper observed Plaintiff had good balance and did not require a cane, had equal and symmetric deep tendon reflexes, no tremors, and normal cerebellar exam. (Tr. 517). She believed the physical examination was unremarkable and that the records possibly showed M.S. but this was unconfirmed by diagnostic testing. (Tr. 518).

Dr. Cooper opined Plaintiff could frequently lift/carry up to 50 pounds and continuously lift/carry up to twenty pounds. (Tr. 508). She further opined Plaintiff could sit/stand/walk for a total of eight hours in a workday but could only stand for four hours at a time without interruption;

9

she also concluded Plaintiff did not need a cane. (Tr. 509). Dr. Cooper found Plaintiff could continuously operate foot controls and continuously reach, handle, finger, feel, and push/pull. (Tr. 510). Next, she opined Plaintiff could frequently climb stairs/ramps, stoop, kneel, crouch, and crawl, and only occasionally balance or climb ladders or scaffolds. (Tr. 511). She also restricted Plaintiff from extreme heat and cold, and unprotected heights but found he could perform all activities of daily living. (Tr. 512-13).

*State Agency Reviewers*

On February 1, 2012, Aracelis Rivera, Psy.D., opined Plaintiff had mild restrictions in activities of daily living, and moderate difficulties in social functioning and maintaining concentration, persistence, and pace. (Tr. 83-84). Dr. Rivera found Plaintiff had moderate limitations in understanding and memory. (Tr. 86). These restrictions were due to his low average intellect and inattention but he could perform 1-2 step instructions. (Tr. 86). Plaintiff was also moderately limited in his ability to sustain concentration and persistence, but was able to perform 1-2 step tasks where an individual was able to occasionally redirect him. (Tr. 87). As to social functioning, Plaintiff was moderately limited and Dr. Rivera opined he could only interact superficially. (Tr. 87). Plaintiff also had moderate adaptive limitations. (Tr. 87-88).

On reconsideration, Patricia Semmelman, Ph.D., opined Plaintiff could understand and follow 1-3 step uncomplicated instructions, either orally or written. (Tr. 117). She agreed Plaintiff would need occasional redirect assistance but believed him capable of 1-3 step instructions. (Tr. 118). Dr. Semmelman concurred that he was moderately limited in social functioning and limited him to only superficial interaction. (Tr. 119). She also found him moderately limited in adaptive functioning and restricted him to work in a static setting with few workplace changes in routine. (Tr. 119). Dr. Semmelman also found Plaintiff to be less than credible because of inconsistencies

between reports in the medical record and statements Plaintiff made to the consultative examiner. (Tr. 119).

Initially in February 2012, William Bolz, M.D., opined Plaintiff could occasionally lift/carry 50 pounds, frequently lift/carry 25 pounds, sit/stand/walk for about six hours in an eight-hour workday, never climb ladders, ropes, or scaffolds, and occasionally balance. (Tr. 85). These restrictions were due to "instability of MS". (Tr. 85). On reconsideration in August 2012, Gary Hinzman, M.D., reduced Plaintiff's lift/carry abilities to occasionally twenty pounds and frequently lift/carry ten pounds. (Tr. 115). He also added a restriction to avoid even moderate exposure to hazards such as machinery or unprotected heights; but otherwise adopted Dr. Bolz's other restrictions. (Tr. 116-17).

*ALJ Decision*

In January 2014, the ALJ concluded Plaintiff had the severe impairments of demylenating disease, major depressive disorder, PTSD, panic disorder without agoraphobia, and generalized anxiety disorder; but these severe impairments did not meet or medically equal any listed impairment. (Tr. 18-21). The ALJ then found Plaintiff had the RFC to perform less than a full range of light work. (Tr. 21). Specifically, he could never climb ladders, ropes, or scaffolds; occasionally balance; and he had to avoid even moderate exposure to workplace hazards. (Tr. 21). He retained the ability to perform simple, repetitive tasks in a static environment with few changes and only superficial interaction with others; but he could make simple work-related decisions. (Tr. 21). Considering the VE testimony and Plaintiff's age, work experience, and RFC, the ALJ found Plaintiff could perform work in representative occupations such as inspector, packer, or stock clerk. (Tr. 28).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

    1.    Was claimant engaged in a substantial gainful activity?

    2.    Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

    3.      Does the severe impairment meet one of the listed impairments?

    4.      What is claimant's residual functional capacity and can claimant perform past relevant work?

    5.      Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The Commissioner considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ erred because (1) her RFC for light work was not supported by substantial evidence, specifically it did not take into account the progressive worsening of his disease; and (2) she improperly weighed the opinion of consultative psychologist, Dr. Morse. (Doc. 14, at 11-15). Plaintiff also makes an argument within his first assignment of error that the ALJ was required to develop a complete record and she failed to do so. (Doc. 14, at 13).

## *RFC*

A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence. § 416.929. The RFC determination is one reserved for the ALJ. 20 C.F.R. § 416.946(c); *Poe v. Comm'r of Soc. Sec.*,

13

342 F. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician."); SSR 96-5p, 1996 WL 374183, at *5. If the ALJ's decision was supported by substantial evidence, this Court must affirm. *Walters,* 127 F.3d at 528.

Plaintiff argues the RFC is not supported by substantial evidence because the ALJ's determination was based on an outdated opinion which was over a year old and ignored the more recent evidence of disease progress from the Cleveland Clinic. (Doc. 14, at 11). He further argues the ALJ was not in a position to interpret this later evidence without the assistance of a medical professional and her failure to obtain another opinion was in error. (Doc. 14, at 12-13). Both arguments lack merit.

First, substantial evidence exists in the record to support a determination that Plaintiff is capable of a restricted level of light work. The objective evidence in the record reveals relatively normal (and unchanged) physical examination findings for over two years of treatment; he was consistently found to have grossly normal neurological findings and normal reflexes and muscle strength. (Tr. 383-34, 400-02, 414-15, 424-26, 428-34, 449-50, 460-61, 465-67, 469-72, 476-77, 481-83, 494, 504-07, 517). Further, diagnostic testing did not substantiate a diagnosis of M.S. and was generally normal or inconclusive; even in October 2013 when Plaintiff's condition supposedly worsened. (Tr. 384, 386-87, 540, 549, 552). Also, there is no evidence of Plaintiff's complaints of blurred vision or slurred speech throughout Dr. Bauer's medical records and he was Plaintiff's treating physician for over two years. (*See* Tr. 414-15, 424-26, 428-34, 449-50, 460-61).

In addition to the lack of objective evidence, the ALJ's finding that Plaintiff lacked credibility also undermined the alleged severity of symptoms. Although, Plaintiff claimed to be disabled due to his M.S. starting in January 2009, he did not seek any medical treatment for his condition for over two years. (*See* Tr. 381, 383). And Plaintiff confirmed he did not have his first

disabling M.S. attack until around June 2011. (Tr. 439-40). On multiple occasions in the record, Plaintiff's self-reported activities are inconsistent, such as reports of smoking, drug use and medication compliance; and Dr. Cooper, the consultative examiner, found him to be an incomplete historian. (*See* Tr. 48-49, 381, 399, 414, 424, 492, 515-16, 521). Dr. Hersh also made a note that Plaintiff's symptoms could be exaggerated due to his mental state. (Tr. 552). Ultimately, Plaintiff did not challenge the lessened credibility the ALJ afforded him and thus, Plaintiff's complaints of complete disability are diluted by these inconsistencies in the record.

Furthermore, state agency reviewer, Dr. Hinzman's opinion, was consistent with both the evidence at the time it was rendered and the evidence garnered at the consultative examination by Dr. Cooper in October 2013. As noted above, the objective examinations and diagnostic evidence available to Dr. Hinzman in August 2012 revealed relatively normal findings. And the findings remained normal – and unchanged – for the next nine months of medical treatment by Dr. Bauer. (*See* Tr. 465-67, 469-72, 476-77, 481-83, 494). Even in October 2013, Dr. Cooper performed muscle and reflex testing on Plaintiff, which revealed no abnormalities, and did not correlate with his alleged symptoms. (Tr. 504-07). Thus, Dr. Hinzman's opinion was consistent with two years of grossly normal findings and with evidence obtained contemporaneous to Plaintiff's complaints of worsening symptoms. *See McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) (finding an ALJ does not err by relying on a prior opinion as long as the remainder of the medical record is considered to take into account any more recent relevant changes in condition). Overall, the ALJ had substantial evidence in the record to support her RFC.

Turning now to Plaintiff's second argument, that the ALJ was required to obtain another medical opinion to interpret the findings of the Cleveland Clinic in October 2013; this argument is without merit because the ALJ obtained a consultative examiner's report in October 2013. This consultative examination was performed contemporaneously with Plaintiff's visits to the

Cleveland Clinic, and revealed completely different objective findings. The report returned normal physical findings in all areas; observations that were consistent (or improved over) other medical evidence in the record. (Tr. 504-18). The ALJ even gave the Plaintiff the benefit of the doubt that his M.S. was not active at the time of his examination because the consultative examiner found no evidence of his symptoms. (Tr. 25, 504-18).

An ALJ is only required to obtain further evidence when the record does not contain sufficient evidence to make a determination on disability. 20 C.F.R. § 404.1519. Not only did the record contain sufficient evidence, including records from the Cleveland Clinic after the ALJ hearing, the ALJ also obtained a consultative examination less than one month prior to the hearing. Further, the records from the Cleveland Clinic provide no definitive evidence of diagnosis; it was actually noted that the two MRIs performed did not correlate with Plaintiff's symptomology and Dr. Cohen remarked that more tests were needed to "clarify whether he, in fact, has MS." (Tr. 552-53). Based on the entirety of the record, including the consultative examination one month before the hearing, the ALJ did not abuse her discretion in not ordering further opinion evidence. *See Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010). Simply because the ALJ gave the benefit of the doubt to Plaintiff and did not rely on the less restrictive consultative examination report does not mean that the record was insufficient to make a finding on disability.

### *Weight of Dr. Morse's Opinion*

In his second assignment of error, Plaintiff argues the ALJ erred because she did not provide an analysis of the weight she gave to Dr. Morse's restrictions, but only addressed the diagnoses and the GAF score. (Doc. 14, at 14-15). The ALJ gave great weight to Dr. Morse's diagnoses and moderate weight to the GAF score, "as it is merely a snapshot of functioning at the time of examination". (Tr. 26). Next, the ALJ concluded that Dr. Morse's opinion was based

16

solely on Plaintiff's subjective reporting and that the Plaintiff had not sought any mental health treatment despite recommendations to do so. (Tr. 26).

When evaluating a medical source, an ALJ must weigh medical opinions in the record based on certain factors. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id*. As well as any fact "which tend[s] to support or contradict the opinion". § 404.1527(c). An ALJ must provide "good reasons" for the weight given to a treating source, *Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 391 (6th Cir. 2004), but this is not so if a non-treating or non-examining source is involved. *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (holding "the SSA requires ALJs to give reasons for only *treating* source" opinions) (emphasis in original); *Murry v. Comm'r of Soc. Sec.*, 2013 WL 5428734, at *4 (finding "[n]otably, the procedural 'good reasons' requirement does not apply to non-treating physicians.").

In reviewing the ALJ's opinion there are two reasons provided for discounting the weight of Dr. Morse's opinion: first, Plaintiff's lack of credibility and second, the opinion was inconsistent with the other evidence of record. (Tr. 26-27). This second reason is actually contained in the discussion of the state agency psychologist's opinions; the state psychologists did not fully credit the opinion of Dr. Morse due to inconsistencies and the ALJ gave their opinions great weight thereby, implicitly adopting their conclusions regarding Dr. Morse's opinion.

The ALJ discounted Dr. Morse's opinion because it was based on Plaintiff's subjective reports and the ALJ had already found Plaintiff to be not entirely credible, a conclusion that Plaintiff did not challenge. It necessarily follows that where an opinion is based on the self-reported symptoms of an unreliable plaintiff, the weight of the opinion will likewise be diminished

17

by this unreliability. *See, e.g., Smith v. Comm'r of Soc. Sec.,* 482 F.3d 873, 875–77 (6th Cir. 2007) (holding that physician's opinions are not due much weight when premised upon reports made by a patient that the ALJ found to be incredible); *Wilson v. Colvin,* 2014 WL 1576884 (N.D. Ohio); *Gordon v. Comm'r of Soc. Sec.,* 2016 WL 318190 (S.D. Ohio). Plaintiff's complaints of severe mental issues are further undermined by his lack of mental health treatment; in fact, the record is devoid of any attempt to receive mental health treatment despite recommendations to do so. Ultimately, Plaintiff's credibility (or lack thereof) goes toward the supportability of Dr. Morse's opinion which is an appropriate factor for the ALJ to consider in weighing opinions.

As to inconsistency of Dr. Morse's findings, the state psychologists, and particularly Dr. Semmelman on reconsideration, outlined the inconsistencies which detracted from the weight of Dr. Morse's opinion. (*See* Tr. 117-19). She noted although Dr. Morse opined Plaintiff had great difficulty with attention, Plaintiff did not need breaks, repetition, or redirection during the examination and participated fully in the give and take of the interview; and he did not present as distractible to any medical sources in the record. (Tr. 118). The ALJ also remarked that Dr. Morse himself stated Plaintiff "had no difficulty expressing his thoughts in an organized manner." (Tr. 26). Dr. Semmelman further noted that while Dr. Morse found Plaintiff would have difficulty with social relationships, Plaintiff was driven to the exam by a friend and was cooperative with the examiner, both of which indicate an ability to relate on a superficial level. (Tr. 119). This is supported by Plaintiff's reports of visiting his children at least three times a week. (Tr. 119, 308). Lastly, Dr. Semmelman remarked that Plaintiff's activities of daily living belied an inability to adapt; for example, he cared for a dog, lived with a friend, performed light chores, shopped, and drove. (Tr. 119, 304-08). Furthermore, Plaintiff reported performing these activities on a function report after seeing Dr. Morse thus, the Court can conclude that his abilities either increased after the consultative examination or he was capable of even greater activity at the time he saw Dr.

18

Morse; either of which undercuts Dr. Morse's opined restrictions. While the ALJ did not specifically reiterate all these inconsistencies, a review of the opinions adopted by the ALJ clearly shows citation to inconsistent record evidence to undermine Dr. Morse's opinion. Thus, at no time was the Plaintiff unable to determine why Dr. Morse's opinion was given less weight and the ALJ did not err.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB and SSI is supported by substantial evidence, and therefore affirms the decision of the Commissioner.

                                               s/James R. Knepp II
                                               United States Magistrate Judge